**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **STACI TALAMONTI,** | § | |
| *Plaintiff* | § | **CIVIL ACTION NO. _____** |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **M/I HOMES OF HOUSTON, LLC** | § | |
| **d/b/a TRIUMPH HOMES** | § | |
| *Defendant* | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE,

COMES NOW Plaintiff, Staci Talamonti, and files this, her Original Complaint and Jury Demand against M/I Homes of Houston, LLC, d/b/a Triumph Homes, and in support thereof would respectfully submit the following:

### I.    PARTIES

1.    Plaintiff Staci Talamonti is a citizen of the State of Texas, and resides in Harris County.

2.    Defendant M/I Homes of Houston, LLC d/b/a Triumph Homes is a foreign for-profit corporation, incorporated in Delaware, with its principle office in Columbus, Ohio, and at least two branch offices in Texas as of 2010. The entity's registered agent is Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, which may be served at 211 E. 7th Street, Suite 620, Austin, TX 78701-3136.

### II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over Ms. Talamonti's claims pursuant to 28 U.S.C. §1331.

4.    Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in the District. Ms. Talamonti worked for M/I Homes of Houston, LLC from their Houston Office in Harris

County, Texas, which is in the Southern District of Texas. Moreover, Defendant has significant business ties to the state of Texas.

5.    This cause also arises under Federal Question, pursuant to Plaintiff's claims under the Americans with Disabilities Act Amendments Act of 2008, under 42 U.S.C. §12101 *et seq*.; and the Family Medical Leave Act of 1993, pursuant to 29 U.S.C. §2601 *et seq*, and Title VII of 42 U.S.C. §2000e *et seq*.

### III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.    Plaintiff's claims consist of multiple violations of the Americans with Disabilities Act (2008 Amended), in tandem with Title VII of the Civil Rights Act of 1964.

8.    Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue.  See *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).  That requirement has been satisfied and the Complainant has received a timely Statutory Notice of Right To Sue Letter.

9.    Accordingly, Plaintiff has made timely complaint to the Equal Employment Opportunity Commission, by and through charge No. 460-2021-02765.  This charge was completed and a Statutory Notice of Right to Sue was issued on or about August 17th, 2022. Ninety (90) days hence would place the filing deadline at midnight on November 15th, 2022. Hence this instrument is timely filed.

### IV. FACTUAL ALLEGATIONS

10.    Staci Talamonti was formally diagnosed with ADHD, Major Depressive Disorder, Asthma, Irritable Bowel Disease, and Anxiety, prior to her employment with the Defendant.

11.    On or about June 16, 2016, Ms. Talamonti was recruited by Area President Jay McManus of M/I Homes as a Marketing Manager.  Ms. Talamonti and Mr. McManus previously

had worked together at Drees Homes. Mr. McManus and Ms. Talamonti had a positive

work history prior. At that time, Mr. McManus had no knowledge of Ms. Talamonti's

medical conditions.

12. Ms. Talamonti was qualified for her position as a Marketing Manager. Moreover, Ms.

Talamonti received a bonus for her performance and also wage increases for years 2016

and 2017.

13. In April of 2018, Kathy Delgado was promoted from Sales Manager to VP of Sales and

Marketing. At that point, Ms. Delgado then became Ms. Talamonti's supervisor.

14. Ms. Delgado had previous experience as a pharmaceutical representative which prompted

her to ask questions of not only Ms. Talamonti, but other employees as well, regarding

their doctor's visits or medical conditions.

15. It should be noted that Ms. Delgado is not a physician, was not a physician in charge of

Ms. Talamonti, and had not executed a HIPAA authorization with Ms. Talamonti, or any

other M/I Homes employee that the Plaintiff is aware of. Hence her inquiries were

entirely inappropriate and in contravention of the Americans with Disability Act of 1990,

as amended.

16. Ms. Talamonti felt very uncomfortable and reported the behavior of Ms. Delgado to

Human Resources in mid 2018.

17. Thereafter, Ms. Talamonti started experiencing resistance from Ms. Delgado when it

came to Ms. Talamonti having to leave to go to a medical appointments. Ms. Delgado

consistently made Ms. Talamonti justify the need to go to the medical appointments, with

extreme articulation and detail unnecessary for an employer.

18.    Due to the stress that Ms. Talamonti was experiencing from Ms. Delgado's behavior, Ms. Talamonti began communicating with her therapist more about work and expressed her anxieties with her psychiatry team.

19.    Despite the stress and pressure at work, Ms. Talamonti went on to receive a bonus and a wage increase for the year 2018.

20.    Unfortunately, in 2019, Ms. Delgado's behavior towards Ms. Talamonti regarding her medical appointments became worse.

21.    In Spring of 2019, Ms. Talamonti learned about FMLA and ADA protections when she saw that a newer employee was treated differently by Ms. Delgado due to that employee's mental health issues that she had shared with Ms. Delgado.  During HR meetings regarding the newer employee, Mallory Markham (Stewart) the M/I Homes Human Resources representative, mentioned to Ms. Delgado that they would have to get rid of, or fire, the new employee *before* she qualified and applied for FMLA.  Ms. Markham went on to explain that this was necessary because after the one year mark, it would be hard to get rid of her (the new employee).[1]

22.    Having witnessed this conversation within her own management team, Ms. Talamonti experienced an icing effect - whereby she then knew with certainty that if she reached out to the Human Resources representative with her host of disabilities, the likely repercussion was immediate termination.

23.    Ms. Talamonti was questioned numerous times by Ms. Delgado, Ms. Markham, and other HR representatives regarding the new employee's health concerns.

---

[1] Ms. Talamonti personally witnessed this conversation, and several others of a similar nature.

24.     This questioning became so egregious that Ms. Delgado pressured Ms. Talamonti to show Ms. Delgado the text messages between the new employee and Ms. Talamonti from Ms. Talamonti's personal phone.  The text messages were outside of work hours and not on company property.

25.     Thereafter, Ms. Delgado and the HR representatives treated the new employee as potentially dangerous due to her mental health diagnosis.  HR coached extensively on how to deal with potentially dangerous employees.  Ultimately this new employee was terminated prior to the termination of Ms. Talamonti, and prior to that employee reaching the one-year mark necessary to apply for protected leave under FMLA.

26.     After witnessing the new employee be terminated, Ms. Talamonti approached HR to request FMLA so that she could get to her medical appointments without Ms. Delgado's extensive and intrusive questioning regarding Talamonti's medical appointments.

27.     Instead, the Defendant's Human Resources representative insisted that Ms. Talamonti did not need to file for FMLA because M/I Homes knew how well Ms. Talamonti was performing and they did not need official documentation for Ms. Talamonti to leave for her medical appointments.

28.     It was at this time, in late March / early April of 2019, that Ms. Talamonti disclosed her medical diagnoses to HR.

29.     On or around May 2019, Ms. Talamonti's psychiatrist completed the FMLA paperwork for Ms. Talamonti to give to M/I Homes.  M/I Homes accepted the FMLA paperwork and approved Ms. Talamonti's reasonable accommodation request of working from home when she was having a bad mental health day.

30.    Ms. Talamonti became aware the Ms. Delgado and Mr. McManus were upset due to Ms. Talamonti's FMLA leave and even heard Mr. McManus and Ms. Delgado arguing about it within Ms. Delgado's office.

31.    Sometime in July of 2019, Ms. Talamonti scheduled an endoscopy that required her to take a day off of work.  Ms. Talamonti has IBS that is directly related to her anxiety disorder which was approved with her prior FMLA paperwork.  *However*, since a new medical professional would be involved, HR told Ms. Delgado that Ms. Talamonti did not have approved FMLA for her endoscopy.

32.    Ms. Delgado and Mr. McManus came into Ms. Talamonti's office to confront her about her endoscopy appointment.  Ms. Talamonti was unaware that there would be a problem with her FMLA for this particular procedure, and informed Mr. McManus and Ms. Delgado she would submit additional FMLA paperwork including this new physician.

33.    Ms. Talamonti, minutes up to her endoscopy, was still working answering work emails. Prior to being put under, Ms. Talamonti spoke with her doctor about the FMLA paperwork that she needed for work and her doctor agreed to fill out the required documents.  Ultimately, Ms. Talamonti submitted the FMLA paperwork to HR.

34.    Shortly after Ms. Talamonti's endoscopy, Mr. McManus and Ms. Delgado informed Ms. Talamonti that she would be required to fill out hourly calenders of clock-in and clock-out times, even though Ms. Talamonti was a salaried employee.[2]

35.    Ms. Talamonti complied and submitted weekly reports to Ms. Delgado and HR.  Due to the stress Ms. Talmonti was under, Ms. Talamonti missed other medical appointments,

---

[2] Up until this point, Ms. Talamonti had never been required to do this, and upon personal information, no other employee was required to comply with similar time records.

since she became anxious about having her doctors appointments highlighted, and having to track every minute in conjunction with her medical leave.

36.    Ms. Talamonti started receiving criticism from Ms. Delgado and Mr. McManus for things that had never previously been an issue.  These criticisms from Ms. Delgado and Mr. McManus last from July - October of 2019.  This caused Ms. Talamonti to have to attend more psychiatric appointments and overall her mental health declined.  Prior to this period, Ms. Talamonti had no negative performance history.

37.    Mr. McManus and Ms. Delgado requested Ms. Talamonti undertake an extensive personality test for "coaching reasons" that only ended up showing Ms. Talamonti's depression, anxiety and ADHD.  No other M/I Homes employees in the Defendant's Marketing department were required to submit to a "personality test" – for coaching reasons or otherwise – at either the outset or interim of their employment. Moreover, to the Plaintiff's knowledge, her employer has no policy requiring  personality testing done of any employees at any stage of employment.

38.    In November of 2019, Ms. Talamonti's mental health started to decline even more. However, despite this, Ms. Talamonti was still performing well and breaking records for marketing metrics.

39.    Around December of 2019, Mr. McManus a Ms. Delgado called Ms. Talamonti into Mr. McManus's office to discuss a performance improvement plan, despite the fact that Talamonti was performing well at work.

40.    During this meeting, the employer's Human Resources representative was on the phone in Mr. McManus's office during this meeting, and was listing symptoms of ADHD.

41. Ms. Delgado reiterated the symptoms HR listed, and said Ms. Talamonti needed to work on organization. To date, Talamonti had never received any negative performance reviews involving or referencing organization or organizational skills. Ms. Delgado also added a large amount of paperwork for Ms. Talamonti to complete – all of which Ms. Talamonti had in fact already completed.

42. Ms. Talamonti emailed M/I Home Human Resources representative stating her concerns that her work environment and treatment from Ms. Delgado and Mr. McManus changed *after* Ms. Talamonti disclosed her mental health diagnosis. HR responded that Ms. Talamonti was not being discriminated against. However, HR did not conduct an investigation stemming from Ms. Talamonti's concerns. Upon information and belief, exactly no ameliorative measures were taken by Human Resources, despite Ms. Talamonti's concerns.

43. Due to the increased stress and anxiety, Ms. Talamonti started seeing her psychiatrist twice a week. Despite her efforts, Ms. Talamonti's mental health declined and she ended up taking short term disability for the rest of December of 2019.

44. Ms. Talamonti received a bonus and wage increase for the year 2020.

45. When Ms. Talamonti returned back to work after her short term disability ending in January of 2020, Ms. Talamonti started working overtime to ensure everything in her department was running smoothly, and to prepare for her upcoming PTO for her honeymoon.

46. Around March of 2020, due to the anxiety of the COVID pandemic, Ms. Talamonti requested to work from home from a few days; this accommodation had previously been approved by HR.

47.     Ms. Talamonti's request was denied and Ms. Talamonti was forced to take unpaid leave for most of March of 2020.

48.     On or about the end of March of 2020, HR announced *via* email that all M/I Homes employees would be allowed to work remotely, including Ms. Talamonti.  However, HR *only* agreed to allow Ms. Talamonti to work remotely with the condition that Ms. Talamonti have a daily phone call with Ms. Delgado at 9am.

49.     No other marketing employees that were working remotely were required to do these daily 9am telephone calls with Ms. Delgado.

50.     Ms. Talamonti complied and called Ms. Delgado daily in which Ms. Delgado would keep Ms. Talamonti on the phone for hours, some days until lunch/noon.  These phone calls lasted until the end of Ms. Talamonti's employment with M/I Homes.

51.     During this time, Ms. Talamonti kept in contact with HR reiterating her concerns that she was being treated differently due to her disabilities.

52.     Despite voicing her concerns repeatedly, no investigation or action was taken by HR after Ms. Talamonti expressed her concerns.

53.     In July of 2020, Ms. Delgado called Ms. Talamonti to inform her that Ms. Talamonti was thriving working from home and Ms. Delgado was thrilled with Ms. Talamonti's performance.  Ms. Delgado approved a pay raise for Ms. Talamonti.

54.     After July of 2020 through the end of 2020, Ms. Talamonti's mental health continued to decline which resulted in Ms. Talamonti's psychiatrist filling out more FMLA paperwork.  Ms. Talamonti's psychiatrist also wrote an email to M/I Homes HR stating that the treatment Ms. Talamonti was receiving at work was contributing to Ms. Talamonti's poor health.

55.     In January of 2021, all employees returned back to working in the office, minus a select few employees who were allowed to continue working remotely - only having to return to the office for meetings or to visit a property that M/I Homes was developing.

56.     Ms. Talamonti continued to receive praise for her metrics. However, in the middle of January, Ms. Delgado and Mr. McManus stated that they had created a plan for the division of trackers that they wanted shown separately even though Ms. Talamonti was already doing that.  Ms. Talamonti was informed that the report would be sent from corporate marketing one time to Ms. Delgado and Mr. McManus and they would speak about it every Monday moving forward.

57.     Ms. Talamonti noticed that the reports were incorrect and Ms. Talamonti would spend time correcting the reports.  Ms. Talamonti asked corporate about the reports due to the fact that the reports that were being released showed that Ms. Talamonti was underperforming.  These inaccuracies caused Ms. Talamonti to be questioned by Ms. Delgado causing more stress and anxiety to Ms. Talamonti.

58.     No other M/I Homes employees were required to engage in weekly reports with corporate and Ms. Delgado in the manner that Ms. Talamonti was forced to.

59.     Ms. Talamonti emailed HR and expressed her concerns with the inaccurate reports.  Ms. Talamonti also once again explained that she felt that she was being treated differently due to her disabilities and that the company seemed to be doing everything possible to create a reason to terminate her.

60.     Ms. Talamonti completed a self review for 2021 which was normal.  However, Ms. Delgado did not issue Ms. Talamonti am official review.  Ms. Delgado did issue official reviews for all other employees she managed.

61.    In February of 2021, Ms. Talamonti received another bonus, the biggest she ever received from M/I Homes.

62.    Ms. Talamonti started taking more intermittent FMLA during this time, due to the amount of stress and anxiety that came from constant criticism from Ms. Delgado and Mr. McManus daily.

63.    Around February of 2021, Houston lost power and water due to the freeze. While stranded at her home, Ms. Talamonti worked when she was able, since she did not have water or power.  During this period, Ms. Delgado had asked Ms. Talamonti how to do something over text to which Ms. Talamonti responded that she would look into it after she returned back from the grocery store to get water, as Ms. Talamonti - and most of the surrounding area - had no running water.  Ms. Delgado got extremely angry at this response and stated that Ms. Talamonti was "not a team player."  Ms. Talamonti and Ms. Delgado had multiple conversations about the incident where both parties agreed to disagree about the situation.

64.    Ms. Talamonti notified M/I Homes HR about the above incident with Ms. Delgado. HR did not conduct a formal investigation regarding the incident.

65.    In February of 2021, a new employee - who was referred to M/I Homes by Ms. Talamonti - started working at the company.  The premise was, that since Ms. Talamonti was doing well within the Digital Marketing division, that the division somehow needed help.  Ms. Talamonti was elated because she had been requesting a new hire for her division for quite some time, as she had been working the department herself without any support.

66.    Ms. Talamonti was in charge of training the new hire and would send daily reports to Ms. Delgado about what Ms. Talamonti had trained the new hire on and what was still left to

cover.  Due to the amount of requests coming from Ms. Delgado and Mr. McManus, Ms. Talamonti was unable to complete the trainings with the new hire.  Ms. Talamonti was to complete the new hires training in February of 2021.  Ms. Talamonti informed Ms. Delgado that the new hires training would not be completed by the end of February.

67.  Ms. Talamonti stayed in consistent contact with M/I Homes HR representative expressing her concerns with the inaccurate reports and the discrimination she was experiencing from Mr. McManus and Ms. Delgado.

68.  Upon personal information, no formal investigation was initiated by HR regarding the above complaints by Ms. Talamonti, despite their consistency and frequency.

69.  Ms. Talamonti sent her last email to HR at the end of March of 2021 and a few days later she received a phone call from the Vice President of HR, Karla.

70.  On or about March 30th, 2021, within days of sending her last email to Human Resources, Ms. Talamonti received a phone call from the Vice President of Human Resources, Ms. Karla Cupp.  Ms. Cupp stated that Ms. Talamonti's employment was ending.  When Ms. Talamonti questioned why she was being terminated, Karla stated that Ms. Delgado and Mr. McManus were going in a different direction.  Ms. Talamonti replied that she felt as though it was because of her disabilities and multiple complains to HR about Mr. McManus and Ms. Delgado.

71.  Ms. Cupp went on to state that Ms. Talamonti's health insurance would expire at midnight on March 31st, 2021.  Ms. Cupp also stated Mallory Markham, the M/I Homes Human Resources representative, had informed Ms. Cupp of how important

Ms. Talamonti's health insurance was to Ms. Talamonti.

72.     Ms. Cupp stated that due to Ms. Talamonti's service to the division and Ms. Talamonti's

        need for insurance, M/I Homes was offering her a severance package that included four

        months of paid insurance premium.

73.     In response, Ms. Talamonti stated to Ms. Cupp that she did not believe she could afford

        an attorney to review the proposed agreement, and that due to her upcoming

        appointments, and need for multiple prescription medications, that she would need that

        insurance.

74.     Ms. Cupp, the Vice President of Human Resources for M/I Homes, an individual with

        full knowledge of both Ms. Talamonti's medical diagnosis, after hearing that Ms.

        Talamonti could not afford an attorney to review the proposed agreement, expressed

        urgency, and suggested that Ms. Talamonti hurry and sign the proposed agreement, as

        Ms. Talamonti's insurance coverage would lapse within the next twenty-four hours.

75.     Due to Ms. Talamonti's disabilities and her need for insurance coverage, as well as the

        fact that she could not qualify for addition to her husband's insurance policy, left Ms.

        Talamonti with no choice but to sign the proposed severance agreement on March 31st,

        2021, via docusign, out of medical necessity and duress.

76.     Thereafter, Ms. Talamonti filed a complaint with the EEOC in April of 2021, and met

        with an EEOC representative for an interview in July of 2021. After investigation, Ms.

        Talamonti received her statutory notice of right to sue on August 17th, 2022.

### V. CAUSES OF ACTION

77.     Plaintiff reiterates all allegations above, and incorporates them in each argument below *en haec verba*.

**A.     CONTRACTUAL RECISION  – DURESS /COERCION; UNCONSCIONABILITY**

78.     Plaintiff hereby respectfully requests that the court oversee and direct the recision of the separation agreement she acceded to, under duress, as proposed by her former employer, M/I Homes of Houston, LLC, d/b/a Triumph Homes.

79.     **Duress** is generally defined as coercion that overcomes a person's will and causes him or her to comply with demands to which he or she would not yield if acting as a free agent. It also entitles the wronged party to rescission and restitution.[ See *Country Cupboard, Inc. v. Texstar Corp.*, 570 S.W.2d 70, 74 (Tex. Civ. App.-Dallas 1978, writ ref'd n.r.e.); see Ch. 52, Rescission].

80.     There is no legal standard of resistance that a party must exercise to claim duress. See *S.H. Kress & Co. v. Rust*, 97 S.W.2d 997, 1000 (Tex. Civ. App.—Fort Worth 1936), aff'd, 132 Tex. 89, 120 S.W.2d 425, 428 (1938) (duress established by evidence that plaintiff, under illegal arrest, signed release after being told she would be put in jail if she did not sign it).

81.     Ordinarily, there is no duress if the coercion is merely a threat of some action that the threatening party has a legal right to do [*Mitchell v. C.C. Sanitation Company*, 430 S.W.2d 933, 937 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.)].[3]

82.     *However*, duress may still exist when the parties are unequal in bargaining strength and the threat is unduly oppressive to the weaker party. Thus, a threat to discharge an employee may constitute duress and entitle the employee to rescission of an agreement

---

[3] See also see, e.g., *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) And *Ward v. Scarborough*, 236 S.W. 434, 437 (Comm. App. 1922, jdgmt. adopted)

made in fear of discharge, even though the employer had the right to terminate the

employment at will. See *Mitchell v. C.C. Sanitation Company*, 430 S.W.2d 933, 937

(Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.).[4]

83.    **Unconscionability** is evinced when a contract can be shown to be unfair due to its

absolute one-sidedness or the gross one-sidedness of its terms. *In re Poly-Am, L.P.* 2626

S.W.3d 337, 348 (Tex.2008); *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817,

821 (Tex.App. – San Antonio 1996, no writ).

**Procedural Unconscionability**

84.    Procedural Unconscionability focuses on the parties' assent and the facts surrounding the

bargaining process. *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360 371 (Tex. App. –

Houston [14th Dist.] 2000, orig. proceeding). Some form of oppression or unfairness must

taint the negotiation process leading to the agreement's formation. El Paso Nat. Gas Co.

v. Minco Oil & Gas Co., 964 S.W.2d 54, 61 (Tex. App. – Amarillo 1997), *rev'd on other*

*grounds*, 8 S.W.3d 309 (Tex.1999); see *In Re Palm Harbor Homes, Inc.*, 195 S.W.3d

672, 679 (Tex.2006).

85.    Procedural Unconscionability may be evidenced by the following factors: **(a)** the presence

of deception, overreaching, or other unethical business practices. See *El Paso Nat. Gas,*

*964, S.W.2d at 61*; **(b)** the absence of a viable alternative. *El Paso Nat. Gas Co. v. Minco*

*Oil & Gas Co.*, 964 S.W.2d 54, 61 (Tex. App. – Amarillo 1997). E.g. a contract of

adhesion; **(c)** the relative acumen, knowledge, education, and *financial stability* of the

parties involved. *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 61 (Tex.

App. – Amarillo 1997).(emphasis added)

---

[4] See also "Economic Duress" e.g. King V. Bishop, 879 S.W.2d 222, 224 (Tex.App.– Houston [14th Dist.] 1994, no writ.)

**Substantive Unconscionability**

86.    Substantive Unconscionability focuses on the fairness of the contract. In re H.E. Butt, 17

S.W.3d at 371. A contract is substantively unconscionable when it is utterly lopsided –

that is, when there is no reasonable or subjective parity between the values exchanged.

See *El Paso Nat. Gas*, 964 S.W.2d 54, 61-62.

87.    In the instant cause of action, Ms. Talamonti was left with no real choice but to accept the

proposed severance agreement, within twenty four (24) hours, without the benefit of

having an attorney review it with her, and at the threat of losing the only viable avenue of

insurance coverage capable of supporting the host of prescription medications which she

required.

88.    The acute disparity in the bargaining powers between the parties is, and was, both

absolute and immutable. The actual fact that the Vice President of Human Resources both

(i) intimated that she knew how utterly invaluable insurance coverage was to the Plaintiff,

combined with the disparity in knowledge regarding human resources matters, (ii) and

completed by the Vice President's expressed urgency that the Plaintiff accept the terms

and conditions without an attorney, held at the imminent lose of insurance coverage,

crystalizes this cause of action in its entirety.

89.    For the above reasons, the Plaintiff respectfully requests that this Court rescind and

dissolve the severance agreement - or in the alternative, modify same agreement - which

she was essentially forced to execute under imminent duress.

**B.    DISCRIMINATION PURSUANT TO THE AMERICANS WITH DISABILITIES
ACT ( as amended 2008 ) 42 U.S.C. § 12101, *et seq.***

90.    In order to establish a *prima facie* claim for discrimination under the ADAAA it must be

demonstrated that the employee: (1) is disabled as defined under the ADAAA; (2) is

qualified to perform the essential functions of the position occupied or the position

sought, with or without a reasonable accommodation; and (3) that the circumstance suggest that the employee was subjected to an adverse employment action based on that disability. *Hagood* v. *Cty. of El Paso*, 408 S.W.3d 515, 523 (Tex. App.—El Paso 2013, no pet.); *EEOC* v. *LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014). See also *Walton* v. *U.S. Marshal Service*, 492 F.3d 998 (9th Cir. 2007); *Wilking* v. *County of Ramsey*, 153 F.3d 869 (8th Cir. 1998).

91.    It is Mrs. Talamonti's contention that pursuant to the ADAAA, she has established a *prima facie* case of discrimination under those selfsame acts. In satisfaction of the requisite elements outlined in 42 U.S.C. § 12112, *et seq*. & 29 C.F.R. § 1630, *et seq*. Mrs. Talamonti would show that she: (1) was an employee with a known disability pursuant to the ADAAA; (2) was qualified for the position in question and completely able to perform its essential functions with reasonable accommodation [ alterations in scheduling, scheduling accommodations with regards to the effects of her medication, ability to perform all duties and responsibilities when working from home, etc.]; and (3) that circumstances overwhelmingly suggest that she was subject to adverse employment actions [ unsubstantiated performance improvement plans, invasive personality assessment meant, termination, etc. ] based on that disability. *Id.*

92.    By having Ms. Talamonti submit to a "personality test" after learning of her medical / neurological diagnosis, Defendant M/I Homes fundamentally violated her rights under the ADA by using the test – well after the start of her employment – to screen for mental disabilities. A medical examination that may reveal a mental illness is not permitted before a conditional job offer, and it may *never* be permitted unless it is shown to be job-related and consistent with business necessity and not intended to screen out

individuals with disabilities.(emphasis added).[5] The ADA's definition of disability

includes actual or perceived mental impairments, not just physical impairments.[6]

93.   Towards that end, the ADA explicitly limits the ability of employers to use "medical

examinations and inquiries" as a condition of employment in three circumstances: (1)

pre- employment medical examinations are prohibited; (2) using medical examinations

that lack job-relatedness and business necessity is prohibited; (3) using medical examina-

tions which screen out (or tend to screen out) people with disabilities is forbidden.[7]

94.   Thus, if a personality assessment tool is considered a "medical examination" under

the ADA and is not job-related or *could* reveal a disability, it violates the ADA.[8] Key

factors also include the purpose of the test and the employer's intent in giving the test.

95.   As stated above, no other M/I Homes employees were issued this personality test. This

test, and other incidents complained of by Ms. Talamonti, were submitted as complained-

of discrimination, in volume and frequency, to the Defendant's Human Resources

department. To date, Plaintiff is unaware of any ameliorative procedures, protocols, or

investigations initiated by her former employer.

## C.   RETALIATION PURSUANT TO THE AMERICANS WITH DISABILITIES ACT ( as amended 2008 ) 42 U.S.C. § 12101, *et seq*.

96.   A plaintiff pursuing a Retaliation claim must initially establish a *prima facie* case. To do

so, the plaintiff must show: (i) he or she engaged in protected activity; (ii) the employer

carried out an adverse employment action; and (iii) a casual connection between the

---

[5]  29 C.F.R. § 1630.14(c)

[6] 42 U.S.C. §§ 12111 and 12102(2).

[7] 42 U.S.C. § 12112(d)(4)(B). *See also* 29 C.F.R. § 1630.14(c) - medical examination and inquires specifically permitted.

[8]  42 U.S.C. § 12112(d)(1) See also *Tice v. Centre Area Transportation Authority*, 247 F.3d 506, 514 (3rd Cir. 2001) citing *Yin v. California*, 95 F.3d 864, 868 (9th Cir. 1996).

protected activity and the adverse action. *Stewart*, 586 F.3d 321, 331 (5th Cir. 2009).

97.  In the Fifth Circuit, the mixed motive or "motivating factor" standard is also available in circumstantial evidence retaliation cases.  Accordingly a plaintiff can recover if she can show that protected activity was a "motivating factor" in the employment decision, even if other factors also motivated the practice.  See, *e.g. Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); see *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010) (holding mixed-motive standard applies to Title VII retaliation claims even where plaintiff has no direct evidence of retaliation).

98.  An employee may show that he or she has engaged in protected activity by demonstrating either that she participated in an activity protected by the employment statute, or that she opposed an unlawful employment practice prohibited by the employment statute. See *Crawford v. Metro Gov't Nashville & Davidson County*, 555 U.S. at 277-78 (2009).  An employer may not retaliate against an employee for engaging in a protected activity. Pursuant to 42 U.S.C. 2000e-3(a) protected activities include, but are not limited to, (i) the filing of a lawsuit, (ii) a request for maternity leave, (iii) hiring an attorney, or (iv) an informal oral complaint. *Id*.

99.  Plaintiff argues that she has met the required elements under *Stewart*. (i) Plaintiff engaged in protected activity in the form of oral and written complaints regarding perceived and real discrimination against her by Mr. McManus and Ms. Delgado due to her disabilities (as embodied in her multiple emails to Human Resources complaining of same) ; (ii) her employer carried out multiple adverse employment action(s) against her, including testing her personality, placing her on unsubstantiated performance improvement plans, finding fault with her performance only *after* knowledge of her diagnosis, and ultimately, her termination; and (iii) a causal connection between the protected activity and the adverse action exists in fact and in temporal proximity.  *Stewart v. Miss. Transp. Comm'n*, 586

F.3d 321, 331 (5th Cir. 2009). Plaintiff would further argue that the causal nexus is bolstered by the extreme proximity in time between her written and oral complaints and her retaliatory termination.

**D.    FMLA RETALIATION pursuant to 29 U.S.C. §2601 *et seq* / 29 CFR § 825.220 *et seq***

100.    To establish a *prima facie* case of retaliation, the Plaintiff must show (1) that they exercised or attempted to exercise rights afforded by the FMLA; (2) they suffered an adverse employment action; and (3) the adverse employment action had a causal connection to the protected activity. [ Unquestionably, termination is the ultimate adverse employment action. And extreme temporal proximity functions as an immutable causal nexus. ]

101.    Once an employer becomes aware than an employee's need for leave is for a reason that *may* qualify under the FMLA, the employer *must* notify the employee if her or she is eligible for FMLA leave and, if eligible, must also provide a notice of rights and responsibilities under the FMLA.  If the employee is not eligible, the employer *must* provide a reason for ineligibility.[9](emphasis added)  Plaintiff would argue that every last one of her medical maladies and neurological concerns would qualify under the definitions of 29 U.S.C. §2601 *et seq*.

102.    As evidenced above, M/I Homes terminated one female employee with mental disabilities, and did so with full knowledge that the employee had to be terminated prior to the one-year mark which would invoke her eligibility for FMLA coverage under her employer. It takes no leap of logic in understanding that once the Plaintiff's diagnosis was revealed to her managers and supervisors, they immediately began to 'find' reasons to critique her performance and undercut her ability to achieve her goals and duties outlined

---

[9] [Department of Labor form WH-1420] https:// www. dol.gov/ sites/ dolgov/ files/ WHD/ legacy/ files/ fmlaen.pdf

in the responsibilities of her position.  This was crystalized for Ms. Talamonti when her managers and supervisors began to overtly move against this other female employee who shall remain unnamed at this time.

103.    Prior to the revelation of her medical diagnosis, there was an absolute dearth of performance concerns. Yet after revealing her medical concerns, and after approaching Human Resources regarding FMLA leave, the Plaintiff's performance then - and only then - began to fall into question.

104.    Indeed, the Defendant's own HR representatives insisted to Talamonti that she "did not need need to file for FMLA because M/I homes knew how well Ms. Talamonti was performing and they did not need official documentation for Ms. Talamonti to leave for her medical appointments."

## VI.    TALAMONTI IS *NOT* REQUIRED TO SHOW BURDEN SHIFTING under the AMERICANS with DISABILITIES AMENDMENTS ACT of 2008

105.    These claims, as the *Davis* court explained, are <u>not</u> analyzed under a burden-shifting framework. See *Davis*, 188 S.W.3d at 758–59.  The *Davis* court reasoned that "Section 12112(b)(5)(A) of the ADA states that 'unless [the employer] can demonstrate' an undue burden, it may not discriminate." *Id.* at 758 (quoting 42 U.S.C.§ 12112(b)(5)(A)). The Texas Labor Code contains an analogous provision. *Id.* (quoting TEX. LAB. CODE § 21.128). Therefore, under both federal and Texas law, "the employee has the burden to show that the employer failed to implement a reasonable accommodation, and the employer can defend by showing a business necessity or undue burden." *Id.*

106.    Adopting an analysis from the United States Court of Appeals for the Seventh Circuit, the *Davis* court concluded that the burden-shifting framework does *not* apply in these cases because "if the plaintiff proved the elements alleged, he would establish a

direct violation of the ADA, and thus, there is no need for indirect proof and burden

-shifting." *Id.* (citing *Bultemeyer* v. *Fort Wayne Cmty. Schs*., 100 F.3d 1281,

1283–84 (7th Cir. 1996)). In consideration this, it should be noted that M/I Homes has

failed to show any undue burden at any point during Talamonti's employment and need

for accommodations.

## VII.    INFERENCE OF PRETEXT

107. "[W]hen an employer's stated motivation for an adverse employment decision involves

the employee's *performance*, but there is *no supporting documentation*, a jury can

reasonably infer pretext." (Emphasis added) See *Lloyd* v. *Georgia Gulf Corp*., 961 F.2d

1190, 1195 (5th Cir. 1992); (citing *Walther* v. *Lone Star Gas Co.*, 952 F.2d 119, 124 (5th

Cir. 1992); *Hansard* v. *Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1465( 5th

Cir. 1989)("where the only evidence of intent is oral testimony, a jury could always

choose to discredit it.").

108. See *Heinsohn* v. *Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (holding that

summary judgment was not proper in a discrimination case where the employer had *no*

contemporaneous documentation to support its assertions of poor performance against the

employee, and instead relied solely on *after-the-fact documentation* and *testimony from

interested witnesses*)(emphasis added); see also *Burton* v. *Freescale Semiconductor, Inc.*,

798 F.3d at 239-40 (holding that the lack of contemporaneous documentation to support

claims of poor performance may in appropriate cases be evidence of pretext, and

reversing summary judgment that had been entered for the employer by the district court)

## VIII.    JURY TRIAL DEMANDED

109. Plaintiff hereby demands a trial by jury upon the merits of the case, and shall pay cost of

same prior to the advent of trial.

## IX.    DAMAGES

110.    The damages under the Americans with Disabilities Act Amendments Act of 2008, under

42 U.S.C. §12101 *et seq*.; and the Family Medical Leave Act of 1993, pursuant to 29

U.S.C. §2601 *et seq*, and Title VII of 42 U.S.C. §2000e *et seq*. consist of back-pay, front-

pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and

costs. Each component is explained below:

111.    **BACK PAY**. Prevailing claimants under the anti-discrimination laws may recover lost

back-pay and benefits. *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).

The purpose of back pay is to "make whole the injured party by placing that individual in

the position he or she would have been in but for the discrimination." *Sellers v. Delgado

Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

112.    **FRONT PAY**. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979

S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied). Regarding the calculation of front-

pay, the Fifth Circuit has stated that "[f]ront pay is . . . calculated from the date of

judgment to age 70, or the normal retirement age, and should reflect earnings in

mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal

and Equitable Remedies Under the Age Discrimination in Employment Act, 45

MD.L.REV. 298, 330–334 (1986)).

113.    **COMPENSATORY DAMAGES**. Mrs. Talamonti has suffered future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and

other non-pecuniary losses, for which she seeks recovery in this lawsuit under Section

1981 and Title VII. *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002)

(affirming $150,000.00 compensatory damages award under Section 1981 where the

plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1)

(providing for compensatory damages for such harms under Title VII).

114.   Where an employer is found to have engaged in *intentional* discrimination on the basis of

an individual's disability, it can be held liable for Compensatory damages for future

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, and other non-pecuniary losses, as well as punitive damages. (emphasis

added) , 42 U.S.C. §§ 12101 *et seq*.

115.   **PUNITIVE DAMAGES**.  The Defendants intentionally acted with malice and reckless

indifference to Mrs. Talamonti's federally protected civil rights, thus justifying awards of

punitive damages under 42 U.S.C. §§ 12101 & Title VII.  *See, e.g.*, *Abner v. Kansas*

*City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00

punitive damages awards to each plaintiff under Section 1981, even though each plaintiff

was awarded only $1.00 in actual damages, and strongly suggesting that any punitive

damages award up to $300,000.00 per plaintiff would have been appropriate even in the

absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256

(D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981

race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under

Title VII when the discrimination is shown to be with "malice or reckless indifference").

In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S.

Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless

indifference" requirement, the plaintiff does not have to prove that the violation was

egregious or outrageous.  *Id*. at 535-36.

116.   All that is required is proof that the employer knew that it was acting in the face of a

perceived risk that its actions were in violations of the law's prohibition against

discrimination.  *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir.

2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).

117.   Due to the unlawful discrimination and retaliation engaged in by the Defendant, Mrs. Talamonti has experienced concrete economic harm in economic damages, as well as emotional distress.

118.   Moreover, damages are available for ADA retaliation claims. To understand the interaction between the relevant statutory provisions, it is necessary to recognize the basic structure of the ADA.  The ADA contains several sub-chapters commonly referred to as "Titles."   Title I governs "Employment,"  Title II governs "Public Services," and Title III governs "Public Accommodations and Services Operated by Private Entities."  See Title I, 42 U.S.C. §§ 12111 et seq.; Title II, 42 U.S.C. §§ 12131 et seq.; Title III, 42 U.S.C. §§12181 et seq. Each of these sub-chapters, or "Titles," contains its own remedies and enforcement provisions.

119.   Section 102 of Title I, 42 U.S.C. § 12112, prohibits employment-based discrimination, and section 107 of Title I, 42 U.S.C. § 12117, states that the remedies and procedures for violations of Title I are those remedies and procedures available pursuant to Title VII of the Civil Rights Act of 1964, including those found in section 706(g), 42 U.S.C. § 2000e-5(g).[10]

120.   Title V of the ADA, which is titled "Miscellaneous Provisions," contains section 503, 42 U.S.C. § 12203, which broadly prohibits *retaliation and coercion* under Titles I,

---

[10]Section 107(a) of the ADA, 42 U.S.C. § 12117(a), provides: Powers, remedies, and procedures. – The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title [sections 705, 706, 707, 709, and 710 of Title VII of the Civil Rights Act of 1964] shall be the powers, remedies, and procedures this sub-chapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter ...

II, and III.[11]

121. Unlike I, II, and III, however, Title V does not contain its own remedies and procedures provision. Instead, section 503(c) of Title V states that the remedies and procedures available for employment-based retaliation claims under Title I are those remedies available under section 107, 42 U.S.C. § 12117.[12]

122. This statutory scheme establishes that the remedies available for employment-based retaliation claims under section 503 are coextensive with the remedies available at section 107, 42 U.S.C. § 12117, which, in turn, are coextensive with the remedies available pursuant to Title VII, including those at section 706(g), 42 U.S.C. § 2000e-5(g).

123. While section 706(g) does not authorize compensatory and punitive damages, in the 1991 Civil Rights Act, Congress *amended* 42 U.S.C. § 1981 to permit damages in Title VII and ADA cases, like this case, brought under section 706 to seek relief for <u>*intentional*</u> discrimination. See 42 U.S.C. § 1981a(a)(1) (authorizing damages for Title VII cases brought under the powers of section 706);[13] 42 U.S.C. §

---

[11]Sections 503(a) and (b) of the ADA, 42 U.S.C. §§ 12203(a) & (b), provide: (a) Retaliation. – No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. (b) Interference, coercion, or intimidation. – It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

[12]Section 503(c) of the ADA, 42 U.S.C. § 12203(c), provides: Remedies and procedures – The remedies and procedures available under sections 12117, 12133, and 12188 of this title [sections 107, 203, and 308 of the ADA] shall be available to aggrieved persons for violations of subsections (a) and (b) of the section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter.

[13] Section 1981a(a)(1) provides: In an action brought by a complaining party under 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5 or 2000e-16) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. 2000e-2, 2000e-3, or 2000e-16), ... , the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

1981a(a)(2) (authorizing compensatory and punitive damages in ADA cases brought under the powers of section 706).[14]

124.    Accordingly, because compensatory and punitive damages are available for Title VII violations under section 706(g), 42 U.S.C. § 2000e-5(g), they are also available under section 107 of the ADA, 42 U.S.C. § 12117 (which incorporates the remedies of section 706(g)), and therefore – pursuant to section 503(c) of the ADA (which incorporates the remedies and procedures of section 107 of the ADA) – for employment-based retaliation claims.

## X.    PRAYER

Ms. Talamonti asks that she be awarded a judgment against the Defendants for the following:

a.    Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of **$250,000.00**; and,

b.    Prejudgment and post-judgment interest;

c.    The Court-Ordered recision of the severance agreement she entered into under duress and coercion;

d.    Attorney's fees and court costs; and,

e.    All other relief to which Plaintiff is entitled.

Respectfully Submitted,
*/s/Julian Frachtman*

H. Julian Frachtman
SDTX No.:    2695031
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098
ATTORNEY FOR PLAINTIFF

---

[14] Section 1981a(a)(2) provides: In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), ... against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under ... section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112) ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.